# EXHIBIT A

**Wilson, Nia S. (SHB)**

---

| | |
|---|---|
| **From:** | Wilson, Nia S. (SHB) |
| **Sent:** | Friday, March 8, 2024 11:21 AM |
| **To:** | commonlaw119@gmail.com |
| **Subject:** | Clark v. X Corp., et al. -  Courtesy Copies of X Corp. Pleadings |
| **Attachments:** | Doc 24-4 EXHIBIT 3.pdf; Doc 24-3 - EXHIBIT 2.pdf; Doc 24-2 - EXHIBIT 1.pdf; Doc 24-1 DECLARATION OF KENNETH M. TRUJILLO-JAMISON.pdf; Doc 24 DEFENDANT X CORP.'S REQUEST FOR JUDICIAL NOTICE.pdf; Doc 23 - DEFENDANT X CORP.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGEMENT.pdf; Doc 25-1 - DEFENDANT X CORP'S MTD MEMORANDUM OF POINTS AND AUTHORITIES.pdf; Doc 25 - DEFENDANT X CORP'S MTD PLAINTIFF'S COMPLAINT.pdf; Doc 27 - DEFENDANT X CORP'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.pdf; Doc 24-6 - EXHIBIT 5.pdf; Doc 24-5 - EXHIBIT 4.pdf |

Ms. Clark,

Here's a courtesy copy of all of the pleadings that have been filed to date on behalf of X Corp. in this matter. You should have also received notice for these documents from the Court.

Regards,
Nia Wilson

**Nia S. Wilson**
*Associate*
Shook, Hardy & Bacon L.L.P.

nwilson@shb.com
(470) 867-6024



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TAMAH JADA CLARK *EX REL* ANTI-
SEMITISM DEFENSE  LEAGUE

         Plaintiff,

        v.

X CORP. et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:23-CV-05840-JPB

## DEFENDANT X CORP.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S "MOTION FOR DEFAULT JUDGEMENT"

Comes now Defendant X Corp., by special appearance and through its undersigned counsel, and files this Opposition to Plaintiff's "Motion for Default Judgement [sic]" (ECF No. 20), and states as follows:

## INTRODUCTION

Plaintiff's Motion for Default Judgment should be denied for three independent reasons.

*First,* Plaintiff failed to properly serve X Corp. via any of the authorized methods for serving a corporation under Federal Rule of Civil Procedure 4(h). Thus, this Court lacks personal jurisdiction over X Corp., and it may not properly enter default judgment against it.

*Second*, the Motion for Default Judgment should be denied because Plaintiff failed to follow the required procedure under Federal Rule of Civil Procedure 55 for

obtaining a default judgment. The Clerk has not entered default against X Corp., and X Corp. has entered a limited appearance to challenge service and respond to the Complaint. Default judgment may not be entered in these circumstances.

*Third*, the Motion for Default Judgment is procedurally improper because Plaintiff, an unincorporated association, cannot appear *pro se* in this case under local rule 83.1(E)(2)(b)(H) of this Court.

Accordingly, Plaintiff's Motion for Default Judgment should be denied.

## <u>PROCEDURAL BACKGROUND</u>

Plaintiff filed a "Statement of Claim" on December 19, 2023 against X Corp., as well as the World Jewish Congress ("WJC") and the American Israel Public Affairs Committee ("AIPAC"). ECF No. 1. The Court issued a Summons to X Corp. on the same day. ECF No. 2. X Corp. is incorporated in the State of Nevada.

On January 24, 2024, Plaintiff filed an "Affirmation of Service and Notice of Default." ECF No. 18. There, Plaintiff asserts that on December 23, 2023 she mailed a copy of the Summons and Complaint to the address of X Corp.'s corporate headquarters in San Francisco, California by Certified Mail. *Id.* at 5, 25-26.[1] Plaintiff also alleges she made a post the next day on X, X Corp.'s social media platform, including the handle "@X" and containing an image of the Summons. *Id.* at 21.

---

[1] For the Court's convenience, X Corp. cites to the page numbers as listed at the header at the top of Plaintiff's filing (*e.g.*, "Page 5 of 21").

On February 8, 2024, Plaintiff filed the instant Motion for Default Judgment.

## ARGUMENT AND CITATION OF AUTHORITY

**I.**     **Plaintiff's Motion for Default Judgment Should Be Denied Because Plaintiff Failed to Properly Serve X Corp.**

Federal Rule of Civil Procedure 4(h) provides, in relevant part:

[A] domestic . . . corporation . . . must be served:

(1) in a judicial district of the United States:

(A) in the manner prescribed by Rule 4(e)(1) for serving an individual [*i.e.*, by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made]; or

(B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant . . . .

"Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when that defendant has not been served. *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990).

Plaintiff has not and cannot show she properly served X Corp. Plaintiff asserts she attempted service by mailing the Summons and Complaint to X Corp.'s corporate headquarters in California by Certified Mail, and that she made a post on X including the X handle "@X" and including an image of the Summons. ECF No. 18 at 5, 25-26. These attempts at service do not and cannot demonstrate that

- 3 -

"deliver[ed] a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process" under Rule 4(h)(1)(B), and therefore do not constitute service under that rule. *See Escudero v. Fed. Nat'l Mortg. Ass'n*, No. 2:14-CV-20-WCO, 2014 WL 12544771, at *2 (N.D. Ga. Apr. 3, 2014) ("service by mail is insufficient under 4(h)(1)(B)").

Plaintiff also cannot demonstrate that she complied with Rule 4(h)(1)(A) by serving X Corp. "in the manner prescribed by Rule 4(e)(1)," *i.e.*, in a manner that complied with the "state law for serving a summons" in Georgia, "where the district court is located," or California, "where service is made." Fed. R. Civ. P. 4(e)(1).

Under Georgia law, Plaintiff was required to personally serve the summons and Complaint on certain authorized representatives of X Corp. Ga. Code Ann. § 9-11-4(e); *see, e.g.*, *Mallory v. DHI Mortg. Co.*, No. 1:18-CV-4579-WMR, 2018 WL 9917672, at *6 (N.D. Ga. Nov. 29, 2018) ("requires personal service upon the appropriate corporate official or authorized agent"). And although corporations foreign to Georgia like X Corp. may be served by mail if the corporation fails to maintain a registered agent in Georgia, Ga. Code Ann. § 14-2-504(b), X Corp. does maintain one. *See* https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=3930274&businessType=Foreign%20Profit%20Corporation&fromSearch=True

(designating as X Corp.'s registered agent CT Corporation System, at a physical address in Lawrenceville, Georgia). Thus, Plaintiff's mailing of the Summons and Complaint to X Corp.'s corporate address did not comply with the service requirements under Georgia law.[2]

Plaintiff also failed to serve X Corp. in a manner that complies with California law. Under relevant parts of California Code of Civil Procedure section 416.10, Plaintiff could have properly served X Corp. "by delivering a copy of the summons and complaint" to either X Corp.'s registered "agent for service of process" or X Corp.'s "president, chief executive officer, or other head of the corporation, a vice president, a secretary or assistant secretary, a treasurer or assistant treasurer, a controller or chief financial officer, a general manager, or a person authorized by the corporation to receive service of process." *Id.* at § 416.10(a)-(b). As noted, Plaintiff did not deliver a copy of the Summons and Complaint to X Corp.'s registered agent, nor to any of the listed company officers or to anyone authorized by X Corp. to

---

[2] Even if X Corp. did not maintain a registered agent in Georgia (and it does), Plaintiff's attempt at service would still fail to comply with Georgia law. To constitute valid service, Plaintiff was required to address the Summons and Complaint packet to X Corp.'s chief executive officer, chief financial officer, or secretary of the corporation at its principal office, and also serve a copy of the process on the Secretary of State. O.C.G.A. § 14-2-1510(b). Plaintiff addressed her packet to X Corp.'s corporate address in California and did not address it to any of the listed officers of X Corp. *See* ECF No. 18 at 5, 25-26. Plaintiff therefore did not meet these requirements, either.

receive service or process. *See* ECF No. 18 at 5, 25-26 (alleging Plaintiff served X Corp. via "USPS Certified Mail" and by publicly posting the Summons on X).

Plaintiff's attempt at service also fails because Plaintiff did not file a notice and acknowledgement signed by X Corp. that mail service was effectuated and authorized by California Code of Civil Procedure section 415.30. *See* ECF No. 18 (providing no allegations or evidence that Plaintiff provided the required notice and acknowledgment to X Corp.; *see Austin v. Lyft, Inc.*, 21-CV-09345-JCS, 2021 WL 6617452, at *1 (N.D. Cal. Dec. 13, 2021) (stating that service by certified mail is improper under Rule 4(h)(1)(A) and that service by mail under California law "is valid only if the complaint and summons are served with the required notice of acknowledgement and an envelope addressed to the sender with prepaid postage *and* the recipient has signed and returned the acknowledgement of receipt." (emphasis in original)). Therefore, Plaintiff's mailing of the Summons and Complaint to X Corp.'s corporate address did not comply with the requirements to serve X Corp. under California law.[3]

Because Plaintiff failed to properly serve X Corp. with the Complaint and Summons, this Court has no personal jurisdiction over X Corp., and Plaintiff may

---

[3] Nor did Plaintiff effect service by publication on X. Service by publication can only be made "if upon affidavit it appears to the satisfaction of the court in which the action is pending that the party to be served cannot with reasonable diligence be served in another manner specified . . . ." Cal. Civ. Proc. Code § 415.50(a).

not obtain a default judgment against X Corp. *See* Fed. R. Civ. P. 4(k); *see also Printed Media Servs. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993) (holding that a federal court lacks jurisdiction over a defendant who was improperly served). Therefore, the Plaintiff's Motion for Default Judgment should be denied.

## II.     Plaintiff's Motion for Default Judgment Should Be Denied Because Plaintiff Did Not Follow the Proper Procedure to Obtain Default Judgment

Federal Rule of Civil Procedure 55(a) permits defaults to be entered only "where a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." To obtain a default judgment (Fed. R. Civ. P. 55(b)), Plaintiff must go through a two-step procedure. *Fernandes v. OJ Installations, LLC*, 1:19-CV-4152-AT, 2022 WL 3571098, at *1 (N.D. Ga. June 29, 2022). *First*, under Rule 55(a), the "party seeking a default judgment must file a motion for entry of default with the clerk of a district court by demonstrating that the opposing party has failed to answer or otherwise respond to the complaint." *Am. Auto. Ass'n, Inc. v. AAA Auto Sales, LLC*, No. 1:16-CV-01159, 2016 WL 10957245, at *1 (N.D. Ga. Oct. 20, 2016). *Second*, under Rule 55(b), "once the clerk has entered a default, the moving party may then seek entry of a default judgment against the defaulting party. *Id*. Generally, these "steps may not be combined into one," *Id*. The "clerk's entry of default must precede an application for default judgment," *Fernandes*, at *1 (internal quotation marks omitted).

Plaintiff's Motion for Default Judgment should be denied because Plaintiff did not even attempt to follow this two-step procedure. Before filing her Motion for Default Judgment, Plaintiff did not first file a motion for entry of default, and the Clerk has not entered default. Plaintiff's Motion for Default Judgment therefore is premature. *See AAA Auto Sales*, 2016 WL 10957245, at *1; *Fernandes*, at *1.

Plaintiff's Motion for Default Judgment also should be denied as moot because the Clerk has not entered a default against X Corp., and the company has entered a limited appearance to move to dismiss the Complaint. *See* Defendant X Corp.'s Motion to Dismiss Plaintiff's Complaint, filed concurrently (arguing the Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) because her claims are barred by section 230 of the Communications Decency Act of 1996, 47 U.S.C. § 230 and the First Amendment, and because she fails to plead facts sufficient to state a cause of action; and pursuant to Federal Rule of Civil Procedure 12(b)(5) for her failure to properly serve the Summons and Complaint on X Corp.). Because X Corp. has appeared to defend itself in this lawsuit, default judgment should not be entered. *See Wahl v. McIver*, 773 F. 2d 1169, 1174 (11th Cir. 1985) (entry of default judgment is a "drastic remedy which should only be used in extreme situations"); *United Am. Corp. v. Bitmain, Inc*., No. 18-cv-25106, 2019 WL 10058715 (S.D. Fla. Nov. 22, 2019), *aff'd and adopted*, 2020 WL 4923666 (S.D. Fla. Jan. 15, 2020), at *2 ("the Eleventh Circuit disfavors defaults, maintaining

a strong policy of determining cases on the merits." (internal quotation marks omitted)).

Accordingly, Plaintiff's Motion for Default Judgment should be denied.

## III. Plaintiff's Motion for Default Judgment Is Improper Because Plaintiff, Who Is Appearing Pro Se, Cannot Bring an Action on Behalf of the Anti-Semitism Defense League, an Unincorporated Entity

Plaintiff Tamah Jada Clark filed this action on behalf of "the Anti-Semitism Defense League," which Plaintiff describes as "an unincorporated common law ""entity."" Compl. at 4 of 18, ECF No. 1. Local Rule 83.1(E)(2)(b)(H) provides that "if the client is a corporation or organization, it may only be represented by an attorney, who must sign all pleadings and papers submitted to the Court," which applies to unincorporated organizations. *See McDermott v. Stacks Publ'g Grp.,* No. 1:18-cv-05767-ELR, 2019 WL 13244544, at *1 (N.D. Ga. Apr. 12, 2019) (striking answer filed by the "owner" of "an artificial, unincorporated entity" on the grounds that the entity could appear only through an attorney); *see also Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985) (artificial entities, such as corporations and limited partnerships, must be represented by counsel).

No attorney has appeared on behalf of Plaintiff in this case, and Plaintiff's Motion for Default Judgment, like all other filings Plaintiff has made in this case,

was not signed by an attorney representing Plaintiff.[4] Plaintiff may not proceed *pro se* in this case on behalf of the unincorporated Anti-Semitism Defense League, and accordingly the Motion for Default Judgment is procedurally improper and should be denied or stricken. *See McDermott*, 2019 WL 13244544, at *2.

## CONCLUSION

For the reasons set forth above, X Corp. respectfully requests the Court deny Plaintiff's Motion for Default Judgment.

Dated: February 20, 2024

Respectfully submitted,

SHOOK HARDY & BACON L.L.P.

/s/ *Colin K. Kelly*

_____

Colin K. Kelly
Georgia Bar No. 781072
ckelly@shb.com
Nia S. Wilson
Georgia Bar No. 914011
nwilson@shb.com
1230 Peachtree Street NE
Suite 1200
Atlanta, GA 30309-3591
(470) 867-6012 (direct CKK)
(470) 867-6024 (direct NSW)

Kenneth M. Trujillo-Jamison (*pro hac vice* pending)

---

[4] To the extent Tamah Jada Clark purports to represent the Anti-Semitism Defense League in this case, she has proffered no evidence demonstrating she is an attorney, licensed in Georgia or otherwise nor has X Corp. found any.

707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250
ktrujillo-jamison@willlenken.com

*Counsel for Defendant X Corp.¸ via
Special Appearance Only*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Memorandum has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp., via Special Appearance Only*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I served a copy of the foregoing

**DEFENDANT X CORP.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S**

**MOTION FOR DEFAULT JUDGEMENT** upon all parties of record in this

matter using the CM/ECF System.

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via*
*Special Appearance Only*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

TAMAH JADA CLARK *ex rel.*
ANTI-SEMITISM DEFENSE
LEAGUE,

               Plaintiff,

v.

X CORP., WORLD JEWISH
CONGRESS, AMERICAN ISRAEL
PUBLIC AFFAIRS COMMITTEE

               Defendants.

Civil Action No. 1:23-cv-05840-JPB

## DEFENDANT X CORP.'S REQUEST FOR JUDICIAL NOTICE
## IN SUPPORT OF ITS MOTION TO DISMISS

## I.  INTRODUCTION

Under Federal Rule of Evidence 201 and the incorporation-by-reference doctrine, Defendant X Corp. respectfully requests that the Court take judicial notice of, or in the alternative, incorporate by reference, the following documents for purposes of ruling on Defendant X Corp.'s Motion to Dismiss Plaintiff's Complaint, filed concurrently:

1. **Exhibit 1** is a true and correct copy of the archived version of X Corp.'s Terms of Service (the "Terms") as they existed when Plaintiff created her X account in

August 2023, *available at*
https://web.archive.org/web/20230801013559/https://twitter.com/en/tos/ (last
visited February 9, 2024), and is also attached as Exhibit 1 to the Trujillo-Jamison
Declaration. In her Complaint, Plaintiff refers to X Corp.'s Rules and Policies
("Rules") (ECF No. 1 ("Compl.") at 8), which together with the Terms and the
Privacy Policy comprise the User Agreement. *See* Ex. 1 at 1.

2. **Exhibit 2** is a true and correct copy of X Corp.'s Terms in effect when Plaintiff
was allegedly defamed in November 2023, and which remain in effect today,
*available at* https://twitter.com/en/tos (last visited February 9, 2024), and is
attached as Exhibit 2 to the Trujillo-Jamison Declaration. In her Complaint,
Plaintiff references X's Rules (Compl. at 8), which together with the Terms and
the Privacy Policy comprise the User Agreement. *See* Ex. 2 at 2.

3. **Exhibit 3** is a true and correct copy of X's Hateful Conduct Policy in effect when
Plaintiff was allegedly defamed in November 2023, and which remains in effect
today, *available at* https://help.twitter.com/en/rules-and-policies/hateful-
conduct-policy (last visited February 9, 2024), and is attached as Exhibit 3 to the
Trujillo-Jamison Declaration. In her Complaint, Plaintiff references and directly
quotes from X's Hateful Conduct Policy and cites to the above-listed URL. *See*
Compl. at 8.

4. **Exhibit 4** is a true and correct copy of the webpage for Plaintiff's Twitter account profile for the handle @The_ADL_dot_org, *available at* https://twitter.com/theadl_dot_org (last visited February 13, 2024), and is attached as Exhibit 5 to the Trujillo-Jamison Declaration. In her Complaint, Plaintiff alleges she created a X account and used X, and that her X handle is "@The_ADL_dot_org." *See* Compl. 7 (Plaintiff "published to 'X' social media platform"), 18 (signature block). A true and correct copy of Plaintiff's X account webpage shows that the account was created in August 2023. *See* Ex. 5 ("Joined August 2023").

5. **Exhibit 5** is a true and correct copy of the archived version of the sign-up page for new X account holders as it existed when Plaintiff created her X account in August of 2023, *available at* https://web.archive.org/web/20230801165313/https://twitter.com/i/flow/signup (last visited February 13, 2024), and is attached as Exhibit 4 to the Trujillo-Jamison Declaration. In her Complaint, Plaintiff alleges she used Twitter and that her Twitter handle is "@The_ADL_dot_org." *See* Compl. 7 (Plaintiff "published to 'X' social media platform"), 18 (signature block). A true and correct copy of Plaintiff's X account webpage shows that she created the account in August 2023. *See* Ex. 4 ("Joined August 2023").

## II.   LEGAL STANDARDS

### A.   Judicial Notice

Courts may take judicial notice of facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Facts not subject to reasonable dispute are ones that (1) are "generally known within the trial court's territorial jurisdiction" or (2) can be "accurately and readily determined from sources whose accuracy cannot reasonably be questions." *Id.*; *see Kojha v. Orexigen Therapeutics, Inc.*, 899 F.3d 999, 1001 (9th Cir. 2018). When ruling on a motion to dismiss, a court may consider material that is appropriate for judicial notice. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Kohjha*, 899 F.3d at 998; *In re Floor & Decor Holdings, Inc. Sec. Litig.*, No. 1:19-CV-2270-SCJ, 2020 WL 13543880, at *2 (N.D. Ga. Sept. 21, 2020) ("*Floor & Décor*") (taking judicial notice of exhibits and considering those exhibits in ruling on motion to dismiss).

### B.   Incorporation By Reference

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. A document may be incorporated by reference, "if the document's contents are alleged in a complaint and no party questions those contents." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Hines v. Midland Mortg. Co.*, No. 1:22-CV-5056-MHC-JSA, 2023 WL 2933343, at *3 (N.D. Ga. Feb. 22, 2023) (taking judicial notice

of the security deed at issue because its authenticity is "undisputed by Plaintiff and is central to her claims"); *Williamson v. Bank of Am., N.A.*, No. 1:14-CV-02824-AT-JFK, 2015 WL 11517083, at *4 (N.D. Ga. June 8, 2015), *report and recommendation adopted as modified*, 2015 WL 11605553 (N.D. Ga. July 13, 2015) ("The foreclosure notice is central to Plaintiff's claims, and Plaintiff does not dispute the authenticity of the notice"); *see also In re Apple Inc. Device Performance Litig.*, 386 F.Supp.3d 1155, 1165 (N.D. Cal. 2019) ("[A] document may be incorporated even if is never referenced directly in the Complaint if the claim necessarily depended on the document."); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation-by-reference doctrine applies "equal force" to Internet pages).

## III.   LEGAL ARGUMENT

### A.   The Exhibits Meet the Requirements of Fed. R. Evid. 201(b)

Exhibits 1 through 5, which are copies of publicly available webpages[1], are properly subject to judicial notice because their contents are not subject to reasonable dispute. *See, e.g.*, *S. Ass'n of Colleges & Sch. Comm'n on Colleges, Inc. v. Bennett Coll.*, No. 1:21-CV-03060-VMC, 2022 WL 5241217, at *1 (N.D. Ga. Sept. 23, 2022), *aff'd*, No. 22-13289, 2023 WL 2231773 (11th Cir. Feb. 27, 2023) (taking judicial notice of facts on a webpage); *Juniper Networks, Inc. v Shipley*, 394 F.

---

[1] Exhibits 1 and 4 are true and correct archived copies of publicly available webpages.

App'x 713, 2010 WL 3591783, at *1 (Fed. Cir. Sept. 10, 2010) ("it is not uncommon for courts to take judicial notice of factual information found on Internet websites"); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1255 (10th Cir. 2007) (same principle); *Altes v. Bulletproof 60, Inc.*, No. 2:19-cv-04409-ODW(SKx), 2020 WL 902520, at *2 (C.D. Cal. Feb. 25, 2020) (taking judicial notice of, among other documents, a screen capture of a website).

Courts also routinely take judicial notice of social media platforms' terms of services and policies, like Exhibits 1 through 4. *See Capua v. Air Europa Lineas Aereas S.A. Inc.*, No. 20-CV-61438-RAR, 2021 WL 965500, at *2 (S.D. Fla. Mar. 15, 2021) (taking judicial notice of an archived copy of Expedia's terms of use obtained from Internet Archive's Wayback Machine); *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 869 (N.D. Cal. 2022) (taking judicial notice of Twitter's terms of service); *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *3 (same); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018) (taking judicial notice of Google's Terms of Service); *Matera v. Google Inc.*, 2016 WL 5339806, at *7 (N.D. Cal. Sept. 23, 2016) (same); *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *7 (N.D. Cal. Sept. 26, 2013) (same); *Matera v. Google Inc.*, NO. 15-CV-04062-LHK, 2016 WL 8200619, at *5 (N.D. Cal. Aug. 12, 2016) (Google's privacy policy was the "proper subject of judicial notice").

That Exhibits 1 and 4 are "archived webpages obtained from the Internet

Archive's Wayback Machine does not change this analysis." *Yuksel*, 2022 WL 16748612, at *3 (taking judicial notice of archived webpages using the Wayback Machine); *Tobinick v. Novella*, No. 9:14-CV-80781, 2015 WL 1526196, at *2 (S.D. Fla. Apr. 2, 2015) (taking judicial notice of Internet Archive's history of the webpage); *Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D. Fla. 2019) ("This Court follows the lead of the overwhelming number of courts that have decided the issue and takes judicial notice of the contents of WayBack Machine evidence."); *Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13-13229, 2014 WL 2863871, at *4 (E.D. Mich. June 24, 2014) ("[T]he Internet Archive has been found to be an acceptable source for the taking of judicial notice.").

It is therefore appropriate to take judicial notice of Exhibits 1 though 5. Fed. R. Evid. 201(b).

## B. The Exhibits Meet the Requirements for Incorporation-By-Reference

In the alternative, the Court can and should incorporate Exhibits 1 through 5 under the incorporation-by-reference doctrine.

As explained in X Corp.'s Motion to Dismiss Plaintiff's Complaint, filed concurrently, Plaintiff's Complaint alleges she used X with the handle "@TheADL_dot_org." *See* Compl. 7 ("published to 'X' social media platform"), 18 (signature block). In her Complaint, Plaintiff references and quotes X's Rules, and the Hateful Conduct Policy contained therein. *See* Compl. at 8 (quoting and citing

https://help.twitter.com/ed/rules-and-policies/hateful-conduct-policy). As noted, the Rules, together with the Terms and the Privacy Policy, comprise the User Agreement. *See* Ex. 1 at 1; Ex. 2 at 2. By referencing and quoting the Rules, which are part of the User Agreement, the Terms are also appropriate for incorporation by reference.

Exhibit 5, which is a true and correct copy of Plaintiff's X account webpage showing that she created her X account in August 2023, also should be incorporated by reference because it is central to Plaintiff's claim and its authenticity cannot reasonably be disputed. Plaintiff cannot dispute the authenticity of Exhibit 5 because she references her Twitter handle in her Complaint (Compl. at 18) and also attached a copy of her Twitter webpage as Exhibit E to her Affirmation of Service and Notice of Default (ECF No. 18). That Exhibit also reflects that Plaintiff's Twitter handle is "@TheADL_dot_org.com" and reflects that she created her account in August 2023. *Id.*, Ex. E (@TheADL_dot_org "Joined August 2023").

In short, Exhibits 1-5 are referenced within Plaintiff's Complaint, central to her defamation claim against X Corp., whose authenticity is undisputed. This Court should therefore incorporate Exhibits 1-5 by reference. *See Hines*, 2023 WL 2933343, at *3 (taking judicial notice of the security deed at issue because its authenticity is "undisputed by Plaintiff and is central to her claims"); *Williamson*, 2015 WL 11517083, at *4 ("The foreclosure notice is central to Plaintiff's claims,

and Plaintiff does not dispute the authenticity of the notice").

## IV.    <u>CONCLUSION</u>

For these reasons, X Corp. respectfully requests this Court take judicial notice

of, or in the alternative incorporate by reference, Exhibits 1-5 and consider them in

deciding X Corp.'s Motion to Dismiss Plaintiff's Complaint.


Dated: February 20, 2024


*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via
Special Appearance Only*

.

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Request has been prepared with one of the font and point

selections approved by the Court in LR 5.1(B).

/s/ Colin K. Kelly
Colin K. Kelly

*Counsel for Defendant X Corp., via*
*Special Appearance Only*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I served a copy of the foregoing

**DEFENDANT X CORP.'S REQUEST FOR JUDICIAL NOTICE IN**

**SUPPORT OF ITS MOTION TO DISMISS** upon all parties of record in this

matter using the CM/ECF System.

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via*
*Special Appearance Only*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TAMAH JADA CLARK *ex rel.* ANTI-SEMITISM DEFENSE LEAGUE,<br><br>          Plaintiff,<br><br>v.<br><br>X CORP., WORLD JEWISH CONGRESS, AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE<br><br>          Defendants. | Civil Action No. 1:23-cv-05840-JPB |

## DECLARATION OF KENNETH M. TRUJILLO-JAMISON
## IN SUPPORT OF
## DEFENDANT X CORP.'S REQUEST FOR JUDICIAL NOTICE
## IN SUPPORT OF ITS MOTION TO DISMISS

I, Kenneth Trujillo-Jamison, hereby declare as follows:

1.      I am an attorney at the law firm of Willenken LLP, counsel of record for Defendant X Corp.

2.      I make this declaration in support of X Corp.'s Request for Judicial Notice in Support of Its Motion to Dismiss Plaintiff's Complaint.

3.      Attached as **Exhibit 1** is a true and correct copy of the archived version of X Corp.'s Terms of Service (the "Terms") as they existed when Plaintiff created her X account in August 2023, *available at*

https://web.archive.org/web/20230801013559/https://twitter.com/en/tos/ (last visited February 9, 2024). My office obtained printouts of the archived webpage as it appeared in August 2023 by visiting the web archive known as the Internet Archive Wayback Machine on February 9, 2024 at webarchive.org and entering the URL https://twitter.com/en/tos. The Internet Archive Wayback Machine had archived the website on August 1, 2023. My office then captured a true and correct printout of that webpage (https://web.archive.org/web/20230801013559/https://twitter.com/en/tos/) by using FireShot Pro and verified that the printouts contained an accurate reflection of what appeared on the URL listed above and the facts contained therein.

4.      Attached as **Exhibit 2** is a true and correct copy of X Corp.'s Terms in effect when Plaintiff was allegedly defamed in November 2023, and which remain in effect today, *available at* https://twitter.com/en/tos (last visited February 9, 2024). My office obtained Exhibit 2 by visiting the above-listed URL. My office then captured a true and correct printout of the webpage as it appeared on February 13, 2024 by using FireShot Pro and verified that the printouts contained an accurate reflection of what appeared on the URL listed above and the facts contained therein.

5.      Attached as **Exhibit 3** is a true and correct copy of X Corp.'s Hateful Conduct Policy in effect when Plaintiff was allegedly defamed in November 2023, and which remains in effect today, *available at* https://help.twitter.com/en/rules-

and-policies/hateful-conduct-policy (last visited February 9, 2024). My office obtained Exhibit 3 by visiting the above-listed URL. My office then captured a true and correct printout of the webpage as it appeared on February 9, 2024 by using FireShot Pro and verified that the printouts contained an accurate reflection of what appeared on the URL listed above and the facts contained therein.

6.    Attached as **Exhibit 4** is a true and correct copy of the archived version of X Corp.'s sign-up page for new account holders as it existed when Plaintiff created her X account in August of 2023, *available at* https://web.archive.org/web/20230801165313/https://twitter.com/i/flow/signup (last visited February 13, 2024). My office obtained printouts of the archived webpage as it appeared on August 1, 2023 by visiting the web archive known as the Internet Archive Wayback Machine on February 13, 2024 at webarchive.org and entering the URL https://twitter.com/i/flow/signup. The Internet Archive Wayback Machine had archived the website on August 1, 2023. My office then captured a true and correct printout of that webpage (https://web.archive.org/web/20230801165313/https://twitter.com/i/flow/signup) by using FireShot Pro and verified that the printouts contained an accurate reflection of what appeared on the URL listed above and the facts contained therein.

7.    Attached as **Exhibit 5** is a true and correct copy of the webpage for Plaintiff's X account profile for the handle @The_ADL_dot_org, available at

https://twitter.com/theadl_dot_org (last visited February 13, 2024). My office obtained Exhibit 5 by visiting the above-listed URL. My office then captured a true and correct printout of the webpage as it appeared on February 13, 2024 by using FireShot Pro and verified that the printouts contained an accurate reflection of what appeared on the URL listed above and the facts contained therein.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 20, 2024

_____
Kenneth M. Trujillo-Jamison

# LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Declaration in Support of X Corp.'s Motion to Dismiss has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via
Special Appearance Only*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I served a copy of the foregoing

**DECLARATION OF KENNETH M. TRUJILLO-JAMISON IN SUPPORT**

**OF DEFENDANT X CORP.'S REQUEST FOR JUDICIAL NOTICE IN**

**SUPPORT OF ITS MOTION TO DISMISS** upon all parties of record in this

matter using the CM/ECF System.

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via Special Appearance Only*

# EXHIBIT 1



X  Terms of Service

Terms of Service Archive      Download PDF

# Terms of Service

**Effective: May 18, 2023**

If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States, the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated policies.

If you live in the European Union, EFTA States, or the United Kingdom, the Twitter User Agreement comprises these Terms of Service, our Privacy Policy, the Twitter Rules and Policies, and all incorporated policies.

## Twitter Terms of Service

### If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/rules-and-policies/twitter-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides Twitter and the Services, 1355 Market Street, Suite 900, San Francisco, CA 94103 U.S.A. The words "we", "us", and "our" mean X Corp.

1. Who May Use the Services
2. Privacy
3. Content on the Services
4. Using the Services
5. Disclaimers and Limitations of Liability
6. General

## 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

## 2. Privacy

Our Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

## 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.twitter.com/rules-and-policies/twitter-report-violation#specific-violations and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.twitter.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca
Email: copyright@twitter.com

### Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

Page 2
Twitter Terms of Service
https://web.archive.org/web/20230801013559/https://twitter.com/en/tos/

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://www.pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without our prior consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on Twitter for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.twitter.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/docs/twitter-for-websites), Twitter Cards (https://developer.twitter.com/en/docs/twitter-for-websites/cards/overview/abouts-cards), Public API (https://developer.twitter.com/en/docs), or Sign in with Twitter (https://developer.twitter.com/en/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through our Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/twitter). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms).

## Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. You cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, and 6. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "Twitter Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE TWITTER ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The Twitter Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained

from the Twitter Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE TWITTER ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE TWITTER ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE TWITTER ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

## 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of California (excluding choice of law).

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

If you have any questions about these Terms, please contact us.

**Effective:** May 18, 2023

Archive of Previous Terms

---

# Twitter Terms of Service

### If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/rules-and-policies/twitter-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and Twitter International Unlimited Company (Co. number 503351, VAT number IE9803173Q), an Irish company with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we", "us," and "our," mean Twitter International Company.

---

1. Who May Use the Services
2. Privacy
3. Content on the Services
4. Using the Services
5. Limitations of Liability
6. General

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://www.twitter.com/privacy) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.twitter.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca
Email: copyright@twitter.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit,

display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

## 4. Using the Services

Please review the Twitter Rules and Policies (and, for Periscope, the Periscope Community Guidelines at https://pscp.tv/content), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions, unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without our prior consent is expressly prohibited)); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on Twitter for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of those additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.twitter.com/en/purchaser-terms.html).

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/en/docs/twitter-for-websites), Twitter Cards (https://developer.twitter.com/en/docs/twitter-for-websites/cards/overview/abouts-cards), Public API (https://developer.twitter.com/en/docs), or Sign in with Twitter (https://developer.twitter.com/en/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through our Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/twitter). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms).

### Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

### Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

### Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, and 6. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/en/forms/account-access/appeals/appeals-suspended). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

## 5. Limitations of Liability

By using the Services you agree that X Corp., its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of

Page 5
Twitter Terms of Service
https://web.archive.org/web/20230801013559/https://twitter.com/en/tos/

residence.

## 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos, will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

If you have any questions about these Terms, please contact us.

**Effective:** May 18, 2023

Archive of Previous Terms

| Twitter platform | X Corp. | Help | Developer resources | Business resources |
|---|---|---|---|---|
| Twitter.com | About the company | Help Center | Developer home | Advertise |
| Status | Twitter for Good | Using Twitter | Documentation | Twitter for business |
| Accessibility | Company news | Twitter for creators | Forums | Resources and guides |
| Embed a Tweet | Brand toolkit | Ads Help Center | Communities | Twitter for marketers |
| Privacy Center | Jobs and internships | Managing your account | Developer blog | Marketing insights |
| Transparency Center | Investors | Email Preference Center | Engineering blog | Brand inspiration |
| | | Rules and policies | Developer terms | Twitter Flight School |
| | | Contact us | | |

© 2023 X Corp.          Cookies          Privacy          Terms and conditions

# EXHIBIT 2

 **Terms of Service**

Terms of Service Archive    Download PDF

# Terms of Service

**Effective: September 29, 2023**

## Summary of our Terms

These Terms of Service ("Terms") are part of the User Agreement– a legally binding contract governing your use of X. **You should read these Terms of Service ("Terms") in full, but here are a few key things you should take away:**

- **You will see advertising on the platform:** In exchange for accessing the Services, X and our third-party providers and partners may display advertising to you.

- **When posting Content and otherwise using the Services, you must comply with this User Agreement and Applicable Law:** You are responsible for your use of the Services and your Content. You must comply with this User Agreement, its incorporated policies, and all applicable laws.

- **You must abide by the Services' acceptable use terms:** You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services.

- **We have broad enforcement rights:** X reserves the right to take enforcement actions against you if you do violate these terms, such as, for example, removing your Content, limiting visibility, discontinuing your access to X, or taking legal action. We may also suspend or terminate your account for other reasons, such as prolonged inactivity, risk of legal exposure, or commercial inviability.

- **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services.

- **Your use of the Services is at your own risk:** We provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or others at any time.

- **You have remedies and redress mechanisms, but our liability is limited:** You have a right to terminate this agreement at any time by deactivating your account and discontinuing use of the Services. Note that we will not be liable for certain types of damages as described in the agreement, and in any event, our aggregate liability shall not exceed the greater of $100 USD or the amount you paid us, if any, in the past six months for the Services giving rise to the claim. Further, if you believe that your Content has been copied in a way that constitutes copyright infringement, the reporting process is detailed in these Terms.

Please also note that these Terms incorporate our Privacy Policy (https://x.com/privacy) as well as other terms applicable to your use of the Services and your Content. Finally, these terms may vary depending on where you live, but in any case, you must be at least 13 years old to use X.

---

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

---

# X Terms of Service

### If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides X and the Services, 1355 Market Street, Suite 900, San Francisco, CA 94103 U.S.A. The words "we," "us," and "our" mean X Corp.

1. Who May Use the Services

2. Privacy

3. Content on the Services

4. Using the Services

5. Disclaimers and Limitations
of Liability

6. General

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://www.x.com/privacy) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation#specific-violations and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/twitter-for-websites), X Cards (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards), Public API (https://developer.x.com/docs), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

## Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; (v) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies; or (vi) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. To the extent permitted by law, we may also terminate your account or cease providing you with all or part of the Services for any other reason or no reason at our convenience. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

The Services are Available "AS IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "X Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE X ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The X Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE X ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE X ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at x.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of California (excluding choice of law).

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

If you have any questions about these Terms, please contact us.

**Effective:** September 29, 2023

Archive of Previous Terms

---

# X Terms of Service

### If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your access to and use of the services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and Twitter International Unlimited Company (Co. number 503351, VAT number IE9803175Q), an Irish company, which provides X and the Services, with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we", "us," and "our," mean Twitter International Unlimited Company.

---

1. Who May Use the Services

2. Privacy

3. Content on the Services

4. Using the Services

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services.

5. Limitations of Liability

6. General

If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://www.x.com/privacy) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. However, if you have chosen via our features to limit the distribution of your Content to a restricted community, we will respect that choice. You also agree that this license includes the right to analyze text and other information you provide with the view to improve the Services. You agree that this license includes the right for us to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames if it is appropriate, including for the following reasons: (i) protecting the Services or our users; (ii) compliance with applicable laws or orders from competent authorities; (iii) breach of these Terms or our Rules and Policies or third parties' intellectual property or other rights; (iv) if you or your Content exposes us, other users or any third party to legal or regulatory risk; and/or (v) your prolonged inactivity.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertisements on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. These additional terms are accessible from our sites and applications dedicated to these services or features. By using or paying for any of these additional services, you will have to agree to any additional terms applicable to those services, and those additional terms will then also become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/twitter-for-websites), X Cards (https://developer.x.com/docs/twitter-for-websites/cards/overview/abouts-cards), Public API (https://developer.x.com/docs), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.x.com/docs/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

## Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; (v) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies; or (vi) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies; (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that X Corp., its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at x.com/tos, will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

To the extent permitted by law, you waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

If you have any questions about these Terms, please contact us.

**Effective:** September 29, 2023

Archive of Previous Terms

---

| X platform | X Corp. | Help | Developer resources | Business resources |
|---|---|---|---|---|
| X.com | About the company | Help Center | Developer home | Advertise |
| Status | Company news | Using X | Documentation | X for business |
| Accessibility | Brand toolkit | X for creators | Forums | Resources and guides |
| Embed a post | Jobs and internships | Ads Help Center | Communities | X for marketers |
| Privacy Center | Investors | Managing your account | Developer blog | Marketing insights |
| Transparency Center | | Email Preference Center | Engineering blog | Brand inspiration |
| Download the X app | | Rules and policies | Developer terms | X Ads Academy |
| | | Contact us | | |

© 2024 X Corp.          Cookies          Privacy          Terms and conditions          English ⌄

# EXHIBIT 3

Page 1
X's policy on hateful conduct | X Help
https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy

 **Help Center**

Using X   Managing your account   Safety and security   Rules and policies   Resources ▾   Sign in   🔍   Contact Us 

Help Center  ›  Safety and cybercrime  ›  Hateful Conduct

# Hateful Conduct

## Overview

**April 2023**

You may not directly attack other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease.

X's mission is to give everyone the power to create and share ideas and information, and to express their opinions and beliefs without barriers. Free expression is a human right – we believe that everyone has a voice, and the right to use it. Our role is to serve the public conversation, which requires representation of a diverse range of perspectives.

We recognize that if people experience abuse on X, it can jeopardize their ability to express themselves. Research has shown that some groups of people are disproportionately targeted with abuse online. For those who identify with multiple underrepresented groups, abuse may be more common, more severe in nature, and more harmful.

We are committed to combating abuse motivated by hatred, prejudice or intolerance, particularly abuse that seeks to silence the voices of those who have been historically marginalized. For this reason, we prohibit behavior that targets individuals or groups with abuse based on their perceived membership in a protected category.

If you see something on X that you believe violates this policy, please report it to us.

## What is in violation of this policy?

We will review and take action against reports of accounts targeting an individual or group of people with any of the following behavior, whether within Posts or Direct Messages.

**Hateful references**

We prohibit targeting individuals or groups with content that references forms of violence or violent events where a protected category was the primary target or victims, where the intent is to harass. This includes, but is not limited to media or text that refers to or depicts:

- genocides, (e.g., the Holocaust);
- lynchings.

**Incitement**

We prohibit inciting behavior that targets individuals or groups of people belonging to protected categories. This includes:

- inciting fear or spreading fearful stereotypes about a protected category, including asserting that members of a protected category are more likely to take part in dangerous or illegal activities, e.g., "all [religious group] are terrorists."
- inciting others to harass members of a protected category on or off platform, e.g., "I'm sick of these [religious group] thinking they are better than us, if any of you see someone wearing a [religious symbol of the religious group], grab it off them and post pics!"
- inciting others to discriminate in the form of denial of support to the economic enterprise of an individual or group because of their perceived membership in a protected category, e.g., "If you go to a [religious group] store, you are supporting those [slur], let's stop giving our money to these [religious slur]." This may not include content intended as political in nature, such as political commentary or content relating to boycotts or protests.

Note: content intended to incite violence against a protected category is prohibited under Violent Speech.

**Slurs and Tropes**

We prohibit targeting others with repeated slurs, tropes or other content that intends to degrade or reinforce negative or harmful stereotypes about a protected category. In some cases, such as (but not limited to) severe, repetitive usage of slurs, or racist/sexist tropes where the context is to harass or intimidate others, we may require Post removal. In other cases, such as (but not limited to) moderate, isolated usage where the context is to harass or intimidate others, we may limit Post visibility as further described below.

**Dehumanization**

We prohibit the dehumanization of a group of people based on their religion, caste, age, disability, serious disease, national origin, race, ethnicity, gender, gender identity, or sexual orientation.

**Hateful Imagery**

We consider hateful imagery to be logos, symbols, or images whose purpose is to promote hostility and malice against others based on their race, religion, disability, sexual orientation, gender identity or ethnicity/national origin. Some examples of hateful

Captured by FireShot Pro: 09 February 2024, 15:58:57
https://getfireshot.com

imagery include, but are not limited to:

- symbols historically associated with hate groups, e.g., the Nazi swastika;
- images depicting others as less than human, or altered to include hateful symbols, e.g., altering images of individuals to include animalistic features; or
- images altered to include hateful symbols or references to a mass murder that targeted a protected category, e.g., manipulating images of individuals to include yellow Star of David badges, in reference to the Holocaust.

Media depicting hateful imagery is not permitted within live video, account bio, profile or header images. All other instances must be marked as sensitive media. Additionally, sending an individual unsolicited hateful imagery is a violation of this policy.

**Hateful Profile**

You may not use hateful images or symbols in your profile image or profile header. You also may not use your username, display name, or profile bio to engage in abusive behavior, such as targeted harassment or expressing hate towards a person, group, or protected category.

## Do I need to be the target of this content for it to be a violation of the X Rules?

Some Posts may appear to be hateful when viewed in isolation, but may not be when viewed in the context of a larger conversation. For example, members of a protected category may refer to each other using terms that are typically considered as slurs. When used consensually, the context behind these terms is not abusive, but a means to reclaim terms that were historically used to demean individuals.

When we review this type of content, it may not be clear whether the context is to abuse an individual on the basis of their protected status, or if it is part of a consensual conversation. To help our teams understand the context, we sometimes need to hear directly from the person being targeted to ensure that we have the information needed prior to taking any enforcement action.

**Note:** individuals do not need to be a member of a specific protected category for us to take action. We will never ask people to prove or disprove membership in any protected category and we will not investigate this information.

## What happens if you violate this policy?

Under this policy, we take action against behavior that targets individuals or an entire protected category with hateful conduct, as described above. Targeting can happen in a number of ways, for example, mentions, including a photo of an individual, referring to someone by their full name, etc.

When determining the penalty for violating this policy, we consider a number of factors including, but not limited to the severity of the violation and an individual's previous record of rule violations. The following is a list of potential enforcement options for content that violates this policy:

- Making content less visible on X by:
  - Removing the Post from search results, in-product recommendations, trends, notifications, and home timelines
  - Restricting the Post discoverability to the author's profile
  - Downranking the Post in replies
  - Restricting Likes, replies, Reposts, Quote, bookmarks, share, pin to profile, or engagement counts
  - Excluding the Post from having ads adjacent to it
- Excluding Posts and/or accounts in email or in-product recommendations.
- Requiring Post removal.
  - For example, we may ask someone to remove the violating content and serve a period of time in read-only mode before they can Post again.
- Suspending accounts that violate our Hateful Profile policy.

Learn more about our range of enforcement options.

If someone believes their account was suspended in error, they can submit an appeal.

---

## Share this article

X Post

---

**X platform**
X.com
Status
Accessibility
Embed a post
Privacy Center
Transparency Center
Download the X app

**X Corp.**
About the company
Company news
Brand toolkit
Jobs and internships
Investors

**Help**
Help Center
Using X
X for creators
Ads Help Center
Managing your account
Email Preference Center
Rules and policies
Contact us

**Developer resources**
Developer home
Documentation
Forums
Communities
Developer blog
Engineering blog
Developer terms

**Business resources**
Advertise
X for business
X for creators
X for marketers
Marketing insights
Brand inspiration
X Ads Academy

© 2024 X Corp.        Cookies        Privacy        Terms and conditions        English

Page 3
X's policy on hateful conduct | X Help
https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy

# EXHIBIT 4

Page 1
AntiSemitism Defense (@TheADL_dot_org) / X
https://twitter.com/theadl_dot_org

𝕏

⚙ Settings



## AntiSemitism Defense ✓
588 posts

← AntiSemitism Defense ✓



**Follow**

## AntiSemitism Defense ✓
@TheADL_dot_org

Our commitment to #stophate #stopracism and #stopantisemitism motivates us to educate society through #Love. Do your part! Free resources at: TheADL.org

🔗 TheADL.org   📅 Joined August 2023

**10** Following   **7** Followers

Posts | Replies | Highlights | Media | Likes

📌 Pinned

**AntiSemitism Defense** ✓ @TheADL_dot_org · Oct 31, 2023
We are ELATED 🎉 🎉 🎊 to announce that the STATE OF ISRAEL 🇮🇱🕎 is suing ⚖ the United States and @WhiteHouse for #SLAVERY ⛓ and #GENOCIDE 🔪 💧, under the law of nations @UN. Prepare for heightened #warcrime by the #SynagogueofSatan @sec_council 🙏🖤

💬 1   🔁   ♡   📊 219   🔖 ⬆

### New to X?
Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Trends are unavailable.

Terms of Service  Privacy Policy  Cookie Policy
Accessibility  Ads info  More···  © 2024 X Corp.

# EXHIBIT 5

Page 1
Sign up for Twitter / X
https://web.archive.org/web/20230801165313/https://twitter.com/i/flow/signup



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| TAMAH JADA CLARK *ex rel.* ANTI-SEMITISM DEFENSE LEAGUE,<br><br>        Plaintiff,<br><br>v.<br><br>X CORP., WORLD JEWISH CONGRESS, AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE<br><br>        Defendants. | Civil Action No. 1:23-cv-05840-JPB |

## DEFENDANT X CORP.'S
## MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant X Corp. respectfully moves this Court to dismiss with prejudice the Complaint filed by plaintiff Tamah Jada Clark *ex rel.* Anti-Semitism Defense League, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted, and pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process on X Corp.

This Motion to Dismiss is based on this motion, as well as the concurrently filed Memorandum of Points and Authorities in support of X Corp.'s Motion to Dismiss, X Corp.'s Request for Judicial Notice in Support of Its Motion to Dismiss

(the "RJN"), and the Declaration of Kenneth M. Trujillo-Jamison filed in support of the RJN.

Dated: February 20, 2024

Respectfully submitted,

SHOOK HARDY & BACON L.L.P.

/s/ *Colin K. Kelly*

_____

Colin K. Kelly
Georgia Bar No. 781072
ckelly@shb.com
Nia S. Wilson
Georgia Bar No. 914011
nwilson@shb.com
1230 Peachtree Street NE
Suite 1200
Atlanta, GA 30309-3591
(470) 867-6012 (direct CKK)
(470) 867-6024 (direct NSW)

Kenneth M. Trujillo-Jamison (*pro hac vice* pending)
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250
ktrujillo-jamison@willenken.com

*Counsel for Defendant X Corp.¸ via Special Appearance Only*

# LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Motion has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via Special Appearance Only*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I served a copy of the foregoing

**MOTION TO DISMISS PLAINTIFF'S COMPLAINT** upon all parties of record

in this matter using the CM/ECF System.


*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via
Special Appearance Only*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TAMAH JADA CLARK *ex rel.*
ANTI-SEMITISM DEFENSE
LEAGUE,

               Plaintiff,

v.

X CORP., WORLD JEWISH
CONGRESS, AMERICAN ISRAEL
PUBLIC AFFAIRS COMMITTEE

               Defendants.

Civil Action No. 1:23-cv-05840-JPB

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT X CORP.'S
## <u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ........................................2

I.    The Complaint ..........................................................................................2

II.   X's Terms of Service, Rules, and Hateful Conduct Policy ............................3

III.  Relevant Procedural History...................................................................5

LEGAL STANDARD .........................................................................................6

ARGUMENT AND CITATION OF AUTHORITY .........................................7

I.    Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim..........................................................................................................7

    A.    Section 230 Bars Plaintiff's Claim.........................................................7

        1.    X Corp. is an "interactive computer service" provider...............9

        2.    Plaintiff's content posted on X is information provided by another "information content provider."................................9

        3.    Plaintiff's claim seeks to treat X Corp. as a "publisher." .........11

    B.    The First Amendment Bars Plaintiff's Claim .......................................13

    C.    Plaintiff Fails to State a Plausible Claim for Defamation....................14

        1.    California law applies to Plaintiff's claim against X Corp........14

        2.    Plaintiff's claim is barred by X's Terms...................................15

        3.    Plaintiff fails to plausibly allege a defamation claim. ..............18

II.   Federal Rule of Civil Procedure 12(b)(5) Requires Dismissal of Plaintiff's Complaint Because Plaintiff Failed to Properly Serve X Corp. ......................................................................................................21

III.  The Court Should Not Grant Leave to Amend...........................................24

CONCLUSION ..................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Albra v. Advan, Inc.*,
  490 F.3d 826 (11th Cir. 2007)..................................................................7

*Almeida v. Amazon.com, Inc.*,
  456 F.3d 1316 (11th Cir. 2006)..........................................................8, 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................6

*Austin v. Lyft, Inc.*,
  21-CV-09345-JCS, 2021 WL 6617452 (N.D. Cal. Dec. 13, 2021).....................24

*Bass v. Facebook, Inc.*
  394 F.Supp.3d 1024 (N.D. Cal. 2019) ...................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................6

*Burger King Corp. v. Weaver*,
  169 F.3d 1310 (11th Cir. 1999).............................................................25

*Cooper v. Meridian Yachts, Ltd.*,
  575 F.3d 1151 (11th Cir. 2009).............................................................15

*Cox v. Twitter, Inc.*,
  No. CV 2:18-2573-DCN-BM, 2019 WL 2513963 (D.S.C. Feb. 8, 2019)...........17

*Darnaa, LLC v. Google Inc.*,
  236 F. Supp. 3d 1116, 1123 & n.3 (N.D. Cal. 2017) ...........................17

*Davis v. Raycom Media, Inc.*,
  No. 1:12-CV-106 (TQL), 2013 WL 12320413 (M.D. Ga. Aug. 7, 2013)...........11

*Dowbenko v. Google Inc.*,
  582 F. App'x 801 (11th Cir. 2014) ....................................... 8, 9, 10, 11

*Escudero v. Fed. Nat'l Mortg. Ass'n*,
  No. 2:14-CV-20-WCO, 2014 WL 12544771 (N.D. Ga. Apr. 3, 2014)..............23

*e-ventures Worldwide, LLC v. Google, Inc.*,
  No. 214CV646FTMPAMCM, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017)14, 21

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008)...........................................................8, 12

*Hassell v. Bird*,
  5 Cal. 5th 522 (2018)..............................................................................8

*Hopkins v. Doe*,
No. 11-cv-100, 2011 WL 5921446 (N.D. Ga., Nov. 28, 2011) ................... 11, 25

*Illoominate Media, Inc. v. CAIR Found.*,
No. 19-CIV-81179-RAR, 2019 WL 13168767 (S.D. Fla. Nov. 19, 2019) 7, 8, 13, 15, 17

*Ins. House, Inc. v. Ins. Data Processing, Inc.*,
No. 1:07-CV-0286-BBM, 2008 WL 11333547 (N.D. Ga. Nov. 19, 2008)........14

*Jones v. Twitter, Inc.*,
No. CV RDB-20-1963, 2020 WL 6263412 (D. Md. Oct. 23, 2020) ..................12

*Kahn v. Bower*,
232 Cal. App. 3d 1599, 1612 n.5 (1991)...........................................................20

*Lewis v. YouTube, LLC*,
244 Cal. App. 4th 118 (2015)...........................................................................16

*Mac Isaac v. Twitter, Inc.*
557 F. Supp. 3d 1251 (S.D. Fla. 2021) ............................................................14

*Mallory v. DHI Mortg. Co.*,
No. 1:18-CV-4579-WMR, 2018 WL 9917672 (N.D. Ga. Nov. 29, 2018)..........23

*McCall v. Zotos*,
No. 22-11725, 2023 WL 3946827 (11th Cir. June 12, 2023)...............................7

*McDermott v. Stacks Publ'g Grp.*,
No. 1:18-cv-05767-ELR, 2019 WL 13244544 (N.D. Ga. Apr. 12, 2019)...........22

*McGarry v. Univ. of San Diego*,
154 Cal. App. 4th 97 (2007)............................................................................21

*Med. Marijuana, Inc. v. ProjectCBD.com*,
46 Cal. App. 5th 869 (2020)...........................................................................21

*Mezey v. Twitter, Inc.*,
No. 1:18-cv-21069-KMM, 2018 WL 5306769 (S.D. Fla. July 19, 2018)9, 10, 11, 12

*Moody v. NetChoice*,
144 S. Ct. 478 (2023) ......................................................................................9

*Morton v. Twitter, Inc.*,
No. CV 20-10434-GW-JEMX, 2021 WL 1181753 (C.D. Cal. Feb. 19, 2021).....9

*Murphy v. Twitter, Inc.*,
60 Cal. App. 5th at 29-30 (2021) .............................................................. 12, 17

*Nationwide Logistics, Inc. v. Condor Transp., Inc.*,
270 Ga. App. 277 (2004)................................................................................15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009)......................................................................8

*NetChoice, LLC v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022)........................................... 9, 13, 14

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ...............................14

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023)........................................14

*Pouyeh v. Bascom Palmer Eye Inst.*,
   613 F. App'x 802 (11th Cir. 2015) ..........................................7

*Smith v. DiFrancesco*,
   341 Ga. App. 786, 787–88 (2017)...........................................18

*StopLoss Specialists, LLC v. VeriClaim, Inc.*,
   340 F. Supp. 3d 1334 (N.D. Ga. 2018) ....................................18

*Swain v. Weinstein*,
   No. CV620 082, 2020 WL 8575175 (S.D. Ga. Oct. 23, 2020)...........................11

*Taus v. Loftus*,
   40 Cal. 4th 683 (2007).........................................................18

*Trump v. Twitter Inc.*,
   602 F. Supp. 3d 1213 (N.D. Cal. 2022) ...............................17

*Yuksel v. Twitter, Inc.*,
   2022 WL 16748612 (N.D. Cal. Nov. 7, 2022)........................11

## Statutes

47 U.S.C. § 230 ...................................... 1, 2, 7, 8, 9, 10, 11, 12, 13, 25

47 U.S.C. § 230(c)(1)............................................... 7, 9, 10, 11

47 U.S.C. § 230(e)(3)............................................................7, 8

47 U.S.C. § 230(f)(2)...............................................................9

47 U.S.C. § 230(f)(3)..............................................................10

Cal. Code of Civ. P. § 415.50 .........................................25

Cal. Code of Civ. P. § 416.10 .........................................24

O.C.G.A. § 9-11-4(e) .....................................................23

O.C.G.A. § 14-2-504(b) .................................................23

## Rules

Federal Rule of Civil Procedure 12(b)(5) ................................................. 2, 22, 25

Federal Rule of Civil Procedure 12(b)(6) ...................................................1

Federal Rule of Civil Procedure 15(a) .....................................................25

Federal Rule of Civil Procedure 4(e)(1) ...................................................23

Federal Rule of Civil Procedure 4(h).....................................................2, 22

Federal Rule of Civil Procedure 4(h)(1)(A) ......................................... 23, 24

Federal Rule of Civil Procedure 4(h)(1)(B)...............................................23

Local Rule 83.1(E)(2)(H)..........................................................................22

## **INTRODUCTION**

Federal Rule of Civil Procedure 12(b)(6) compels dismissal of Plaintiff's Complaint. Plaintiff alleges she was defamed because X Corp., purportedly in cooperation with defendants World Jewish Congress ("WJC") and American Israel Public Affairs Committee ("AIPAC"), removed or concealed content Plaintiff published on X (X Corp.'s social media platform previously branded as Twitter), and "falsely charged" it with violating X Corp.'s Hateful Conduct Policy.

Plaintiff's defamation claim fails for four independent reasons:

*First*, section 230 of the Communications Decency Act of 1996, 47 U.S.C. section 230 ("Section 230"), bars Plaintiff's claim. Section 230 immunizes X Corp. from claims, such as Plaintiff's, which seek to hold it liable for its content moderation decisions, including decisions to remove content from its platform.

*Second*, Plaintiff's claim is barred by the First Amendment, which protects X Corp.'s editorial decisions about the speech it allows to be disseminated on its private social media platform, who may make that speech, and how X Corp. enforces its content moderation policies.

*Third*, Plaintiff fails to plausibly allege her claim. Plaintiff's claim is barred by X's Terms of Service, which provide that X Corp. may "remove or . . . limit distribution or visibility" of any content on X at its "sole discretion" and "without liability." Plaintiff also fails to plead facts that, if true, would establish any of the

elements of a defamation claim.

Federal Rule of Civil Procedure 12(b)(5) also requires dismissal of Plaintiff's Complaint, because Plaintiff's attempts at serving X Corp.—by mailing the Summons and Complaint to X Corp.'s corporate address and making a post on X—did not comply with the requirements for serving a corporation under Federal Rule of Civil Procedure 4(h).

Because Section 230, the First Amendment, and the Terms of Service bar Plaintiff's claim as a matter of law, leave to amend should not be granted. Accordingly, X Corp. respectfully requests this Court grant X Corp.'s motion to dismiss with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Complaint

Plaintiff alleges that, between November 3, 2023 and November 8, 2023, X Corp., WJC, and/or AIPAC ("Defendants") made "twenty malicious public notices of 'Hateful Conduct'" by Plaintiff. ECF No. 1 ("Compl.") at 5, 9-10. The only allegedly defamatory statement pleaded by Plaintiff, however, is a summary of a rule in X Corp.'s Hateful Conduct Policy: "You may not promote violence against, threaten, or harass other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease." *Id.* at 5-6. Plaintiff also alleges Defendants "concealed or removed" content she "published to [the] 'X' social media platform." *Id.* at 5-7.

Plaintiff alleges that because "all 20 charges of 'Hateful Conduct' involved Jewish organizations . . . the world can only perceive this to mean PLAINTIFF is anti-Jewish" *Id.* at 8. She alleges Defendants "branded" her with "The Mark" of anti-Semitism, which affects her "character generally in trade and profession as a Hebrew advocate of Semitic persons." *Id.* at 9. Plaintiff also alleges that the "false charges of 'Hateful Conduct' imply that [her] Textbook, Notice, Second Notice, and Website," which she alleges she posted on X (*id.* at 7), "are slanderous, false, and ill-intended to incite violate and promote 'hate crime.'" *Id.* at 9. Plaintiff further alleges the removal or concealment of her content demonstrates Defendants' "aggravated, calculated intent to defame and injure PLAINTIFF with evil motive, actual malice, and deliberate oppression." *Id.* at 7.

Plaintiff asserts a defamation claim against Defendants, purportedly on behalf of "Anti-Semitism Defense League™," which she alleges is "an unincorporated common-law 'entity' used to facilitate the trade of PLAINTIFF." *Id.* at 4. Plaintiff seeks no actual damages, but seeks $12 billion in exemplary damages. *Id.* at 16-17.

## II.   X's Terms of Service, Rules, and Hateful Conduct Policy

Plaintiff alleges she is a user of X, the social media platform provided by X Corp., using the handle "@TheADL_dot_org." Compl. at 7 ("published to 'X' social media platform"); *see id.* at 18 (signature block). Plaintiff created her X account in August 2023. *See* Request for Judicial Notice ("RJN"), Ex. 4 ("Joined August

2023").[1]

In creating her account, Plaintiff necessarily agreed to X's Terms of Service ("Terms"). *Id.*, Ex. 5 ("By signing up, you agree to the Terms of Service and Privacy Policy"), Ex. 1 at 1 ("By using the Services, you agree to be bound by these Terms."). By continuing to use X, Plaintiff agreed to be bound by the Terms. *Id.*, Ex. 1 at 3 ("We may revise these Terms . . . By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms."), Ex. 2 at 4 (same).

The version of the Terms in place in November 2023 when Plaintiff was allegedly defamed gives X Corp. the right to "remove or . . . limit distribution or visibility" of content on Twitter "without liability to [the user]" and to create "limits on use" at its "sole discretion." *Id.*, Ex. 2 at 2. Those Terms also include X Corp.'s disclaimer of liability for the "deletion" of content, and a limitation of liability clause which (a) expressly applies to any theory of liability, including tort; and (b) prohibits

---

[1] X Corp.'s RJN, filed concurrently, seeks judicial notice of the version of the Terms to which Plaintiff agreed when she created her X account in August 2023 (Ex. 1), and the version of the Terms in effect in November 2023 when she alleged defamation occurred (Ex. 2). X Corp. also seeks judicial notice of its Hateful Conduct Policy that was in place when Plaintiff was allegedly defamed (Ex. 3), and which is referenced and quoted in the Complaint (Compl. at 8). Finally, X Corp. seeks judicial notice of a true and correct copy of the sign-up page for new X account holders as it existed in August 2023, when Plaintiff created her X account (Ex. 4), and of Plaintiff's X account webpage referenced in the Complaint, which shows she created her X account in August 2023 (Ex. 5).

liability for indirect, incidental, special, consequential, or punitive damages related to a user's "access to or use of or inability to access or use the services." *Id.*, Ex. 2 at 4; *see also id.*, Ex. 1 at 3. The Terms also state that the "laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you [*i.e.*, Plaintiff] and us [*i.e.*, X Corp.]." *Id.*, Ex. 2 at 4; *id.*, Ex. 1 at 3.

X's Rules (the "Rules," which, with the Terms and the Privacy Policy comprise the User Agreement) "outline conduct that is prohibited" by users on X. *Id.*, Ex. 1 at 2; Ex. 2 at 2. X's Hateful Conduct Policy was part of the Rules in effect in November 2023, when Plaintiff alleges she was defamed. *Id.*, Ex. 3. That policy provides that users "may not directly attack other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease." *Id.* at 1. It also provides, "[u]nder this policy, we take action against behavior that targets individuals or an entire protected category with hateful conduct, as described above." *Id.* at 2. The policy includes a "list of potential enforcement options for content that violates this policy," including "[m]aking content less visible on X," "[r]equiring Post removal," and "[s]uspending accounts that violate our Hateful Profile policy." *Id.*

## III.   Relevant Procedural History

Plaintiff filed the Complaint on December 19, 2023. On January 21, 2024,

Plaintiff filed an "Affirmation of Service and Notice of Default" (ECF No. 18), stating Plaintiff attempted to serve X Corp. the summons and Complaint by mailing a copy via Certified Mail to X Corp.'s corporate address in San Francisco, California and by making a post on X which included the X handle "@X" and included an image of the Summons. *Id.* at 5, 25-26.[2]

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citation omitted) (*Iqbal*). "[P]lausibility" requires the plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"[A]lthough we are to give liberal construction to the pleadings of pro se litigants, we nevertheless have required them to conform to procedural rules." *Pouyeh v. Bascom Palmer Eye Inst.*, 613 F. App'x 802, 806 (11th Cir. 2015) (quoting

---

[2] On February 8, 2024, Plaintiff filed a "Motion for Default Judgement [sic]" (ECF No. 20), to which X Corp. is responding in a concurrently filed response in opposition.

*Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007)).

## ARGUMENT AND CITATION OF AUTHORITY

### I.  Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim

#### A.  Section 230 Bars Plaintiff's Claim

As a threshold legal matter, Section 230 bars Plaintiff's defamation claim because it seeks to hold X Corp. liable for its "traditional editorial functions," including its decisions about what content users may post on X, its social media platform. 47 U.S.C. §§ 230(c)(1), 230(e)(3); *see Illoominate Media, Inc. v. CAIR Found.*, No. 19-CIV-81179-RAR, 2019 WL 13168767, at *3 (S.D. Fla. Nov. 19, 2019), *aff'd on other grounds sub nom. Illoominate Media v. CAIR Florida, Inc.*, 841 F. App'x 132 (11th Cir. 2020) ("Under [Section 230], Twitter cannot be held liable for its decision to exercise traditional editorial functions, such as moderating content on its platform.") (dismissing claims alleging defendant conspired with Twitter where defendant allegedly "reported [plaintiff's] account and convinced Twitter to ban [plaintiff]"); *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *3 (11th Cir. June 12, 2023) ("Lawsuits seeking to hold a service provider . . . liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content—are barred.").

Under Section 230(c)(1), "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(e)(3) provides, aside from

exceptions not relevant here, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

The Eleventh Circuit has construed Section 230 immunity "broad[ly]." *Dowbenko v. Google Inc.*, 582 F. App'x 801, 804 (11th Cir. 2014) (citing *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006)). Accordingly, courts apply Section 230 to "protect websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) ("*Roommates*"); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254-255 (4th Cir. 2009) (Section 230 provides "immunity from suit rather than a mere defense to liability") (citation omitted). Further, given its "capacious language," "attempted end-run[s] around section 230" should be rejected. *See Hassell v. Bird*, 5 Cal. 5th 522, 545 (2018); *Illoominate Media*, 2019 WL 13168767, at *3 (rejecting attempted "end-run around [Section 230's] explicit prohibition that Twitter cannot be held liable for its decision to moderate content on its platform").

Here, all three prongs of the Section 230 analysis are met: (1) X Corp. is an "interactive computer service" provider; (2) Plaintiff's content is "information provided by another information provider"; and (3) Plaintiff's allegations treat X Corp. as a "publisher" of that content. *See* 47 U.S.C. § 230 (c)(1); *Dowbenko*, 582 F. App'x at 804-05. Section 230 therefore provides X Corp. immunity from this suit.

       1.    *X Corp. is an "interactive computer service" provider.*

Section 230 broadly defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer . . . service." 47 U.S.C. § 230(f)(2). As courts unanimously have held, social media platforms, including Twitter, are "interactive computer service providers." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1220 (11th Cir. 2022), *cert. denied in part,* 144 S. Ct. 69 (2023)*, granted in part sub nom. Moody v. NetChoice*, 144 S. Ct. 478 (2023) ("'interactive computer services'—like social-media platforms"); *Mezey v. Twitter, Inc.*, No. 1:18-cv-21069-KMM, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) ("Twitter . . . is an interactive computer service."); *Morton v. Twitter, Inc.*, No. CV 20-10434-GW-JEMX, 2021 WL 1181753, at *3 (C.D. Cal. Feb. 19, 2021) ("Twitter provides the prototypical service entitling it to protections of [Section 230]" and "[e]very decision the Court has seen to consider the issue has treated Twitter as an interactive computer service provider, even at the motion to dismiss stage.") (citation omitted). Plaintiff's allegations require the same conclusion. Compl. at 7 (referring to "'X' social media platform"). Thus, X Corp. is an "interactive computer service" provider within the meaning of the first prong of the Section 230 analysis. 47 U.S.C. § 230(c)(1).

       2.    *Plaintiff's content posted on X is information provided by another "information content provider."*

    Section 230 defines an "information content provider" as "any person or

entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Content posted by third-party users of the X social media platform is "information provided by another information content provider" within in the meaning of the second prong of the Section 230 analysis. *See* 47 U.S.C. § 230(c)(1); *Mezey*, 2018 WL 5306769, at *1 ("Plaintiff is the information content provider as he created the relevant content associated with his Twitter account."); *Dowbenko*, 582 F. App'x at 804 (Section 230 has been applied to provide immunity from "any cause of action that would make service providers liable for information originating with a third-party user of the service.") (citing *Almeida*, 456 F.3d at 1321).

Plaintiff's defamation claim against X Corp. is premised on X Corp.'s alleged moderation of content "PLAINTIFF furnished . . . and subsequently published to 'X' social media platform," which it alleges X Corp. "concealed or removed" and "falsely charged" as violating its Hateful Conduct Policy. Compl. at 5, 7, 9. In other words, Plaintiff seeks to hold X Corp. liable for its decisions regarding "information provided by another information content provider"—i.e., Plaintiff. *See Dowbenko*, 582 F. App'x. 801 (content "authored and posted" by platform users is "information provided by another content provider," regardless of the fact that Google manipulated its visibility); *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *3 (N.D.

Cal. Nov. 7, 2022) (Plaintiff "seeks to hold Twitter liable for decisions regarding 'information provided by another information content provider'—that is, information that he, rather than Twitter, provided.").[3] Thus, the second prong of the Section 230 analysis is satisfied. 47 U.S.C. § 230(c)(1).

### 3. *Plaintiff's claim seeks to treat X Corp. as a "publisher."*

Section 230's third prong is satisfied because Plaintiff seeks to impose liability on X Corp. for its moderation of Plaintiff's content posted on its social media platform—*i.e.*, protected "publishing" activity. 47 U.S.C. § 230(c)(1); *see Mezey*, 2018 WL 5306769, at *1 (Section 230's third prong satisfied where "Plaintiff seeks to hold Twitter 'liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'") (quoting *Roommates*, 521 F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post

---

[3] To the extent Plaintiff seeks to hold X Corp. liable for certain statements by WJC and AIPAC on X, (*see* Compl. at 10 ("done and directed to be done . . . in the name of [WJC] and [AIPAC]")), such claims also are barred by Section 230. *Swain v. Weinstein,* No. CV620 082, 2020 WL 8575175, at * 2 (S.D. Ga. Oct. 23, 2020), *report and recommendation adopted*, No. CV620 082, 2021 WL 620963 (S.D. Ga Feb. 17, 2021) (holding immunity applied because the defendant was not responsible for the relevant third-party posts); *Davis v. Raycom Media, Inc.*, No. 1:12-CV-106 (TQL), 2013 WL 12320413, at *3 (M.D. Ga. Aug. 7, 2013) ("any claims against the Defendant for reader-posted comments to news stories are barred"); *Hopkins v. Doe*, No. 11-cv-100, 2011 WL 5921446, at *2 (N.D. Ga., Nov. 28, 2011) (claims based on defendant's failure to police thirty-party conduct on its website were barred by Section 230).

online is perforce immune under Section 230.")).

On its face, Plaintiff's defamation claim is premised on X Corp.'s alleged "conceal[ment] or remov[al]" of Plaintiff's content and "charging" that it violates X Corp.'s Hateful Conduct Policy. *See* Compl. at 5, 7. X Corp.'s decisions about whether to limit visibility or remove content posted by third-party users on X, and whether third-party content violates its policies, are publishing conduct protected by Section 230. *See, e.g.*, *Mezey*, 2018 WL 5306769, at *1; *Jones v. Twitter, Inc.*, No. CV RDB-20-1963, 2020 WL 6263412, at *2 (D. Md. Oct. 23, 2020) (Section 230 barred defamation claim, among others, premised on plaintiff's account suspension for "violating Twitter's Terms of Service, specifically the Twitter Rules against hateful conduct" because such claims "clearly seek to hold Twitter liable as a publisher of third-party content, as [it] relates to Twitter's decision not to publish Plaintiff's content"); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th at 29-30 (2021) (Section 230's third prong satisfied because "allegations that Twitter 'enforced its Hateful Conduct Policy in a discriminatory and targeted manner' against [plaintiff] . . . by removing her tweets and suspending her account amount to attacks on Twitter's interpretation and enforcement of its own general policies," which are protected publishing activities). The third prong of the Section 230 analysis is satisfied.

Because all three prongs of the Section 230 analysis are met, Section 230

immunizes X Corp. from Plaintiff's defamation claim, which seeks to hold X Corp. liable for its "traditional editorial functions," including its decisions about what content Plaintiff may post on its platform. *See Illoominate Media*, 2019 WL 13168767, at *3. Accordingly, the Complaint should be dismissed with prejudice.

B.    The First Amendment Bars Plaintiff's Claim

Plaintiff's claim also is barred by the First Amendment, which protects X Corp.'s editorial decisions about what content is disseminated on its platform, who may disseminate that content, and how X Corp. enforces its content-moderation policies. "Social-media platforms exercise editorial judgment that is inherently expressive. When platforms choose to remove users or posts, deprioritize content in viewers' feeds or search results, or sanction breaches of their community standards, they engage in First-Amendment-protected activity." *NetChoice, LLC*, 34 F.4th 1196 at 1213. As the Eleventh Circuit reasoned:

> More particularly, when a platform removes or deprioritizes a user or post, it makes a judgment about whether and to what extent it will publish information to its users—a judgment rooted in the platform's own views about the sorts of content and viewpoints that are valuable and appropriate for dissemination in its site.

*Id.* at 1210. Other courts similarly have recognized that "[l]ike a newspaper or a news network, [X Corp.] makes decisions about what content to include, exclude, moderate, filter, label, restrict or promote, and those decisions are protected by the First Amendment." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-88 (N.D. Cal. 2022), *aff'd on other grounds sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir.

2023) (dismissing on First Amendment grounds claims based in part on Twitter account suspension); *Mac Isaac v. Twitter, Inc.* 557 F. Supp. 3d 1251, 1261 (S.D. Fla. 2021) (finding that X Corp. "has a First Amendment right to decide what to publish and what not to publish" (internal quotation marks omitted); *see also e-ventures Worldwide, LLC v. Google, Inc.*, No. 214CV646FTMPAMCM, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) (holding Google's decisions to remove content is protected because the "First Amendment protects these decisions, whether they are fair or unfair, or motivated by profit or altruism.").

Because Plaintiff seeks to hold X Corp. liable for its editorial decisions about what content is disseminated on its private social media platform and for its enforcement of its content moderation policies (Compl. at 5, 7), the First Amendment therefore bars Plaintiff's claim. *See, e.g.*, *NetChoice*, 34 F.4th at 1210.

C.   <u>Plaintiff Fails to State a Plausible Claim for Defamation</u>

   1.   *California law applies to Plaintiff's claim against X Corp.*

"A federal court sitting in diversity applies the conflict-of-law rules of the forum state." *Ins. House, Inc. v. Ins. Data Processing, Inc.*, No. 1:07-CV-0286-BBM, 2008 WL 11333547, at *6 (N.D. Ga. Nov. 19, 2008) (citation omitted). Under Georgia choice-of-law rules, "in the absence of contrary public policy, [Georgia] courts normally will enforce a contractual choice of law provision." *Nationwide Logistics, Inc. v. Condor Transp., Inc.*, 270 Ga. App. 277, 280 (2004). Further, Georgia courts enforce broad choice-of-law provisions that encompass tort claims.

*Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (affirming district court's application of contractual choice of law provision to tort claims).

In agreeing to X's Terms, Plaintiff agreed that California law "will govern . . . any dispute that arises between" Plaintiff and X Corp. RJN, Ex. 2 at 4; *id.*, Ex. 1 at 3. This language "is clearly meant to be read broadly" to encompass tort claims like Plaintiff alleges here. *Cooper*, 575 F.3d at 1162; *see Illoominate Media*, 841 F. App'x at 137 (where tort was alleged, noting that "California law . . . governs Twitter's Terms of Service"). Accordingly, California law governs Plaintiff's claim.

### 2.   *Plaintiff's claim is barred by X's Terms.*

Plaintiff's claim is barred because it arises from X Corp.'s alleged determination that Plaintiff's content violated X Corp.'s Hateful Conduct Policy and its concealment or removal of that content—all which X Corp. is expressly permitted to do by the Terms to which Plaintiff agreed when creating its X account and by using X.

The Terms give X Corp. the right to "create limits on use . . . at [its] sole discretion at any time." RJN Ex. 2 at 2 (§ 4 "Using the Services"); Ex. 1 at 2 (same). The Terms also give X Corp. the right to "remove or refuse to distribute any Content," and "limit distribution or visibility of any Content . . . without liability . .

. ."[4] *Id.* The Terms therefore expressly authorized X Corp. to take the alleged content moderation decisions Plaintiff challenges.

Likewise, in the Terms X Corp. disclaimed "all responsibility and liability for . . . the deletion of . . . any Content." *Id.,* Ex. 1 at 2; *id.*, Ex. 2 at 4. The Terms also provide:

> TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, [X CORP.] SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTLY OR PUNITIVE DAMAGES . . . , RESULTING FROM . . . **YOUR . . . USE OF OR INABILITY TO ACCESS OR USE THE SERVICES.**

*Id.*, Ex. 2 at 4; Ex. 1 at 3 (same). These provisions prevent Plaintiff from holding X Corp. liable for the moderation decisions Plaintiff challenges.

"Limitation of liability clauses 'have long been recognized as valid in California'" and may be used at the pleading stage to reject a party's claims. *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118, 125 (2015) (enforcing limitation of liability clause and affirming sustaining of demurrer). These clauses are particularly "appropriate when one party is offering a service for free to the public." *Id.*; *see also Murphy*, 60 Cal. App. 5th at 36 (X Corp., like other "service providers that offer free services to Internet users may have a legitimate commercial need to limit their

---

[4] Consistent with this provision, the Hateful Conduct Policy sets forth certain of X Corp.'s "enforcement options for content that violates this policy," including "[m]aking content less visible on X," "[r]equiring Post removal," and "[s]uspending accounts that violate our Hateful Profile policy." RJN, Ex. 3 at 2.

liability"). Furthermore, courts routinely enforce online platforms' limitation of liability clauses in suits arising out of conduct protected by the terms of service. *See, e.g.*, *Darnaa, LLC v. Google Inc.*, 236 F. Supp. 3d 1116, 1123 & n.3 (N.D. Cal. 2017) (enforcing YouTube's limitation of liability clause and dismissing complaint), *aff'd sub nom.* 756 F. App'x 674 (9th Cir. 2018); *Bass v. Facebook, Inc.* 394 F.Supp.3d 1024, 1037 (N.D. Cal. 2019) (enforcing Facebook's limitation-of-liability clause).

In short, the Terms' disclaimers and limitations on liability are enforceable on Plaintiff, and protect X Corp. from precisely this type of lawsuit, which challenges X Corp's content moderation decisions on X. *See Illoominate Media,* 841 F. App'x at 137 (noting, "[i]n fact, Twitter's Terms of Service . . . allow Twitter to ban [plaintiff] from its platform for any reason at all"); *Trump v. Twitter Inc.*, 602 F. Supp. 3d 1213, 1227 (N.D. Cal. 2022) (X Corp.'s User Agreement "gave Twitter contractual permission to act as it saw fit with respect to any account or content for any or no reason"); *Cox v. Twitter, Inc.*, No. CV 2:18-2573-DCN-BM, 2019 WL 2513963, at *4 (D.S.C. Feb. 8, 2019), *report and recommendation approved*, No. 2:18-CV-2573 DCN, 2019 WL 2514732 (D.S.C. Mar. 8, 2019) (Plaintiff "failed to state a claim, as [the Terms] clearly provide[] that the Defendant reserves the right to remove content that it deems to have violated the User Agreement," including "[t]he Twitter Rules, which . . . prohibit postings . . . expressing hate . . . based on

religious affiliation").

Because Plaintiff's claim is barred by the Terms, the Complaint should be dismissed with prejudice.

### 3.      *Plaintiff fails to plausibly allege a defamation claim.*

The elements of a defamation claim are: "(a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage."[5] *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (citation omitted).  Plaintiff fails to plausibly allege any of these elements.

Plaintiff alleges it was defamed by "libels"—twenty purported "public notices" "published" on Twitter, which "falsely charged" that Plaintiff's content violated X Corp.'s Hateful Conduct Policy.[6] Compl. at 5-6. Plaintiff further alleges that because "all 20 charges of 'Hateful Conduct' involved Jewish organizations and persons, the world can only perceive this to mean PLAINTIFF is anti-Jewish, and

---

[5] Similarly, under Georgia law the elements of a defamation claim are: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018) (citing *Smith v. DiFrancesco*, 341 Ga. App. 786, 787–88 (2017), *cert. denied* (Dec. 11, 2017)).

[6] Plaintiff also alleges in conclusory fashion that X Corp. "slander[ed]" her "orally" (Compl. at 1-2), but she does not identify *any* alleged oral statement by X Corp. To the extent Plaintiff purports to premise her defamation claim on any slander, she fails to state a claim where the only alleged defamatory statement was alleged to be "published" on X. Compl. at 5-6.

well as anti-Semitic." *Id.* at 8 (§ IV). However, the only allegedly defamatory statements Plaintiff can muster is a summary of a rule in X Corp.'s Hateful Conduct Policy: "You may not promote violence against, threaten, or harass other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease."[7] *Id.* at 2, 5-6.

These allegations fall well short of plausibly alleging X Corp. publicized any false or defamatory statement, let alone did so with the requisite intent for a defamation claim. The only allegedly defamatory statement identified by Plaintiff is a truthful summary of a X Rule—that neither Plaintiff nor any other user is permitted to "promote violence against, threaten, or harass other people on the" listed bases.[8]

Moreover, although Plaintiff repeatedly pleads in conclusory fashion that, for example, "DEFENDANTS implied PLAINTIFF is guilty of anti-Semitism" Compl. 6, she does not plead X Corp. made any such statement. Under California law,

---

[7] The statement seems to summarize X Corp.'s Hateful Conduct Policy, which provides: "You may not directly attack other people on the basis of race, ethnicity, national origin, caste, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease." RJN, Ex. 3 at 1 (Overview).

[8]   Additionally, "[i]n a defamation action the threshold question is whether the statement on which a plaintiff's claim is based, specifically refers to, or is 'of and concerning'" the plaintiff. *Yow v. Nat'l Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1184 (E.D. Cal. 2008). Plaintiff fails to allege how a general statement of X's Rules specifically refers to or is "of and concerning" Plaintiff. Georgia law applies the same standard. *See Fiske v. Stockton*, 320 S.E.2d 590, 592–93 (Ga. Ct. App. 1984) ("If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory.").

"words constituting an alleged libel must be *specifically identified, if not pleaded verbatim*, in the complaint."[9] *Kahn v. Bower*, 232 Cal. App. 3d 1599, 1612 n.5 (1991) (emphasis added). Plaintiff's allegations of an unidentified, implied statement not specifically attributed to anyone are insufficient to allege a libel, particularly as she contends the purported statements are publicly available.[10] Compl. at 9 ("Twenty malicious public notices"); *Med. Marijuana, Inc. v. ProjectCBD.com*, 46 Cal. App. 5th 869, 894 (2020) ("plaintiffs have a written copy of the article published by the defendants; there is simply no justification for them to set forth in their complaint only the 'substance' of the statements that they claim are defamatory, instead of the *actual statements*") (emphasis added).

Plaintiff's attempt at alleging defamation *per se* based on the statements described above (Compl. at 8-9 (alleging claims "are actionable *per* se")) fares no better. A statement can be defamatory *per se* only if a listener can "recognize the defamatory meaning without knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally

---

[9] Georgia law applies the same pleading standard. *See Sarver v. Jackson*, No. CIV.A. 2:08-CV-0077, 2008 WL 4911836, at *4 (N.D. Ga. Nov. 13, 2008), *aff'd*, 344 F. App'x 526 (11th Cir. 2009) ("general allegations, without identifying specific statements, are insufficient to state a claim for slander, libel or defamation").

[10] Likewise, while Plaintiff alleges X Corp. "concealed or removed" her content (Compl. at 7), these allegations of content moderation by X Corp. do not and cannot constitute allegations of a publicized defamatory statement.

attributable to all reasonable persons." *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 112 (2007) (cleaned up). Not only would a listener not "recognize the defamatory meaning" of the only allegedly defamatory statement—a summary of a Twitter Rule—the statement also "would be protected because the statement is true." *See e-ventures Worldwide*, 2017 WL 2210029, at *4 ("But even if Google had published a press release that e-venutures' websites were violating Google's guidelines, that publication would be protected because the statement is true.").

In sum, Plaintiff fails to plausibly allege the elements of a defamation claim. Plaintiff's Complaint against X Corp. therefore should be dismissed.[11]

## II.   Federal Rule of Civil Procedure 12(b)(5) Requires Dismissal of Plaintiff's Complaint Because Plaintiff Failed to Properly Serve X Corp.

Plaintiff's Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5) for insufficient service of process. Plaintiff failed to properly

---

[11] Finally, to the extent Tamah Jada Clark purports to assert her claim on behalf of the Anti-Semitism Defense League, her claim is procedurally improper because that allegedly "unincorporated common-law 'entity'" cannot appear *pro se*, and must be represented by an attorney. *See* Local Rule 83.1(E)(2)(H) ("if the client is a corporation or organization, it may only be represented by an attorney, who must sign all pleadings and papers submitted to the Court"); *McDermott v. Stacks Publ'g Grp.,* No. 1:18-cv-05767-ELR, 2019 WL 13244544, at *1 (N.D. Ga. Apr. 12, 2019) (striking answer filed by the "owner" of "an artificial, unincorporated entity" on the grounds that the entity could appear only through an attorney); *see also Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985) (artificial entities, such as corporations and limited partnerships, must be represented by counsel).

serve X Corp. via any of the authorized methods for serving a corporation under Federal Rule of Civil Procedure 4(h).

Plaintiff attempted to serve X Corp. by sending a copy of the Summons and Complaint via Certified Mail, addressed to X Corp.'s corporate headquarters in San Francisco, and by making a post on X including the handle "@X" that included an image of the Summons. ECF No. 18 at 5, 25, and 31. These attempts at service do not and cannot demonstrate Plaintiff "deliver[ed] a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process," as required by Fed. R. Civ. P. 4(h)(1)(B). *Escudero v. Fed. Nat'l Mortg. Ass'n*, No. 2:14-CV-20-WCO, 2014 WL 12544771, at *2 (N.D. Ga. Apr. 3, 2014) ("service by mail is insufficient under 4(h)(1)(B)").

Plaintiff also did not effectuate service under Georgia law or California law under Federal Rule of Civil Procedure 4(e)(1). *See* Fed. R. Civ. P. 4(h)(1)(A) (permitting service of a corporation "in the manner prescribed by Rule 4(e)(1)); Fed. R. Civ. P. 4(e)(1) (permitting service by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made").

Under Georgia law, Plaintiff was required to personally serve the summons and Complaint on certain authorized representatives of X Corp. O.C.G.A. § 9-11-

4(e); *see*, *e.g.*, *Mallory v. DHI Mortg. Co.*, No. 1:18-CV-4579-WMR, 2018 WL
9917672, at *6 (N.D. Ga. Nov. 29, 2018) ("requires personal service upon the
appropriate corporate official or authorized agent"). Although a corporation foreign
to Georgia like X Corp. may be served by mail if it fails to maintain a registered
agent in Georgia, O.C.G.A. § 14-2-504(b), X Corp. maintains one. *See*
https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=3930274
&businessType=Foreign%20Profit%20Corporation&fromSearch=True
(designating as X Corp.'s registered agent CT Corporation System, at a physical
address in Lawrenceville, Georgia). Thus, Plaintiff's mailing of the Summons and
Complaint to X Corp.'s corporate address did not comply with the requirements to
serve X Corp. under Georgia law.

      Plaintiff's attempt at service also failed to comply with California law,
because Plaintiff did not "deliver[] a copy of the summons and complaint" to either
X Corp.'s registered "agent for service of process" or X Corp.'s "president, chief
executive officer, or other head of the corporation, a vice president, a secretary or
assistant secretary, a treasurer or assistant treasurer, a controller or chief financial
officer, a general manager, or a person authorized by the corporation to receive
service of process," Cal. Code of Civ. P. § 416.10; nor did she file a notice and
acknowledgement signed by X Corp. that mail service was effectuated, Doc. 18 at
4-5, 25; Cal. Civ. P. § 415.30; *see Austin v. Lyft, Inc.*, 21-CV-09345-JCS, 2021 WL

6617452, at *1 (N.D. Cal. Dec. 13, 2021) (service by certified mail is improper under Rule 4(h)(1)(A), and service by mail under California law "is valid only if the complaint and summons are served with the required notice of acknowledgement and an envelope addressed to the sender with prepaid postage and the recipient has signed and returned the acknowledgement of receipt.").[12]

Because Plaintiff failed to properly serve X Corp., this Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5).

## III.    <u>The Court Should Not Grant Leave to Amend</u>

Although Federal Rule of Civil Procedure 15(a) states that courts "should freely give leave [to amend] when justice so requires," dismissal without leave to amend is appropriate where "amendment is futile"—even for pro se plaintiffs. *See Hopkins*, 2011 WL 5921446, at *1 (amendment would be futile because action barred by Section 230); *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999) ("denial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal") (cleaned up). That is the case here. As explained above, Plaintiff's claim is barred by Section 230, the First Amendment, and the Terms governing Plaintiff's use of X. *See* Argument, § I.A.-C.2, *supra*. No

---

[12] Nor did Plaintiff serve X Corp. by publication, which can be made only "if upon affidavit it appears to the satisfaction of the court in which the action is pending that the party to be served cannot with reasonable diligence be served in another manner specified." Cal. Code of Civ. P. § 415.50.

amendment to the Complaint can cure these fatal defects. Accordingly, leave to amend should not be granted.

## **CONCLUSION**

For all these reasons, Plaintiff's Complaint be dismissed with prejudice.

Dated: February 20, 2024

Respectfully submitted,

SHOOK HARDY & BACON L.L.P.

/s/ *Colin K. Kelly*

_____

Colin K. Kelly
Georgia Bar No. 781072
ckelly@shb.com
Nia S. Wilson
Georgia Bar No. 914011
nwilson@shb.com
1230 Peachtree Street NE
Suite 1200
Atlanta, GA 30309-3591
(470) 867-6012 (direct CKK)
(470) 867-6024 (direct NSW)

Kenneth M. Trujillo-Jamison (*pro hac vice* pending)
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250
ktrujillo-jamison@willenken.com

*Counsel for Defendant X Corp.¸ via Special Appearance Only*

- 25 -

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Memorandum has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

/s/ Colin K. Kelly
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via Special Appearance Only*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I served a copy of the foregoing

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**DEFENDANT X CORP.'S MOTION TO DISMISS PLAINTIFF'S**

**COMPLAINT** upon all parties of record in this matter using the CM/ECF System.


*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via*
*Special Appearance Only*

- 27 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| TAMAH JADA CLARK *ex rel.* ANTI-SEMITISM DEFENSE LEAGUE,<br><br>     Plaintiff,<br><br>v.<br><br>X CORP., WORLD JEWISH CONGRESS, AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE<br><br>     Defendants. | Civil Action No. 1:23-cv-05840-JPB |

## DEFENDANT X CORP.'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendant X Corp., by and through its undersigned attorneys and pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.3, respectfully submits this Certificate of Interested Persons and Corporate Disclosure Statement.

X Corp. states that X Corp. is a privately held corporation. Its parent corporation is X Holdings Corp. No publicly traded corporation owns 10% or more of the stock of X Corp. or X Holdings Corp.

The undersigned counsel of record for X Corp. certifies that the following is a full and complete list of all parent corporations that owns 10% or more of the stock of X Corp.: X Holdings Corp.

The undersigned further certifies that the following is a full and complete list of all other persons, associations, firms, partnerships, or corporations having either a financial interest in or other interest which could be substantially affected by the outcome of this case: None.

The undersigned further certifies that the following is a full and complete list of all persons serving as attorneys for X Corp.: Kenneth M. Trujillo-Jamison, Willenken LLP; and Colin Kelly and Nia Wilson, Shook, Hardy & Bacon.

The undersigned further certifies that the following is a full and complete list of the citizenship of X Corp.: Nevada and California.

Dated: February 21, 2024          Respectfully submitted,

SHOOK HARDY & BACON L.L.P.

/s/ *Colin K. Kelly*
_____
Colin K. Kelly
Georgia Bar No. 781072
ckelly@shb.com
Nia S. Wilson
Georgia Bar No. 914011
nwilson@shb.com
1230 Peachtree Street NE
Suite 1200
Atlanta, GA 30309-3591
(470) 867-6012 (direct CKK)
(470) 867-6024 (direct NSW)

Kenneth M. Trujillo-Jamison (*pro hac vice* pending)
707 Wilshire Blvd., Suite 3850

Los Angeles, CA 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250
ktrujillo-jamison@willenken.com

*Counsel for Defendant X Corp.¸ via*
*Special Appearance Only*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this Memorandum has been prepared with one of the font and point selections approved by the Court in LR 5.1(B).

*/s/ Colin K. Kelly*
Colin K. Kelly

*Counsel for Defendant X Corp.¸ via Special Appearance Only*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, I served a copy of the foregoing

**DEFENDANT X CORP.'S CERTIFICATE OF INTERESTED PERSONS**

**AND CORPORATE DISCLOSURE STATEMENT** upon all parties of record in

this matter using the CM/ECF System.

> *s/ Colin K. Kelly*
> Colin K. Kelly
>
> *Counsel for Defendant X Corp., via*
> *Special Appearance Only*